In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 17-2842 & 17-3317

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL SEGAL,

*Defendant-Appellant,*

APPEAL OF: JOY SEGAL,

*Proposed Intervenor.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:02-CR-00112-1 — **Rubén Castillo**, *Judge.*

ARGUED APRIL 4, 2019 — DECIDED SEPTEMBER 16, 2019

Before RIPPLE, HAMILTON, and ST. EVE, *Circuit Judges.*

HAMILTON, *Circuit Judge.* These two appeals present
straightforward issues of contract law, but with some proce-
dural complications. Appellant Michael Segal was convicted
in 2004 of racketeering, mail and wire fraud, making false
statements, embezzlement, and conspiring to interfere with

operations of the Internal Revenue Service. The company he owned, Near North Insurance Brokerage (NNIB), was convicted of mail fraud, making false statements, and embezzlement. The history of Mr. Segal's prosecution is detailed in *United States v. Segal*, 495 F.3d 826 (7th Cir. 2007) (affirming convictions and all aspects of sentence except forfeiture order); *United States v. Segal*, 644 F.3d 364 (7th Cir. 2011) (affirming in part and remanding for discretionary re-sentencing); and *United States v. Segal*, 811 F.3d 257 (7th Cir. 2016) (addressing several issues under settlement of forfeiture obligations).

After Mr. Segal served time in prison, see 811 F.3d at 259, and after further sentencing proceedings, see 644 F.3d at 366–68, he was ordered to forfeit to the government $15 million and his entire interest in NNIB. The company itself was ordered to pay restitution and a fine. 495 F.3d at 830. The government initially restrained approximately $47 million worth of assets of both Segal and NNIB. Liquidation proceedings have continued well into the case's second decade.

Mr. Segal's forfeiture obligations have been disputed for years. See, e.g., 811 F.3d 257. In early 2013, on the eve of what promised to be a complex and contentious hearing over which assets should be forfeited and how much they were worth, Mr. Segal and the government agreed on a court-approved settlement that fulfilled Mr. Segal's $15 million personal forfeiture obligation. Mr. Segal now seeks to rescind or modify that agreement. The district court denied his attempt, and he now appeals. The 2013 settlement, which Mr. Segal has succeeded in enforcing strictly against the government, see *id.* at 261–62, is the first of the two contracts we address here.

The second contract is a related settlement between Mr. Segal's ex-wife, Joy Segal, and the United States government. The Segals divorced in June 2005, after Mr. Segal's conviction. In February 2006, Ms. Segal filed a third-party claim under 18 U.S.C. § 1963(*l*) to intervene in Mr. Segal's forfeiture proceedings. In November 2010, Ms. Segal, too, settled her claims with the government. Under that deal, the government released to her about $7.7 million in restrained assets. In exchange, she relinquished all further claims—save one contingent future interest, at issue here. She now seeks to intervene in the ongoing liquidation proceedings that the district court is administering pursuant to Mr. Segal's forfeiture settlement. The district court denied her attempt at intervention because her contingent future interest is not yet ripe. She also appeals.

We have jurisdiction over both appeals, and we affirm in all respects the district court's challenged orders. Because Ms. Segal's claims depend on Mr. Segal's—jurisdictionally, procedurally, and substantively—we address his first.

I.  *Michael Segal's Challenge to his Settlement Agreement*

A.  *Appellate Jurisdiction*

We begin with appellate jurisdiction, which the government challenges on the ground that Mr. Segal filed his notice of appeal too late. See, e.g., *United States v. Lilly*, 206 F.3d 756, 760 (7th Cir. 2000) (timely notice of appeal is prerequisite for appellate jurisdiction). Mr. Segal appeals from two orders: the district court's denial of his motion to modify his forfeiture order, entered on July 12, 2017, and its denial of his motion to amend that order, entered on August 16, 2017. R. 2100, 2107. He filed his notice of appeal in the district court on September 6, 2017.

The notice of appeal was too late if we apply the 14-day deadline for a defendant's criminal appeal in Federal Rule of Appellate Procedure 4(b)(1)(A), but it was timely if we apply the 60-day deadline in 28 U.S.C. § 2107(b) and Rule 4(a)(1)(B) for civil appeals where the United States is a party. Counting on the civil appeal deadline for an appeal of such ancillary orders in a criminal case is risky, but we find that this appeal is civil in substance and that Mr. Segal's notice was therefore timely.

Strictly speaking, the time limit in a criminal case is not jurisdictional, in the sense that a failure to comply may not be overlooked or waived, because the time limit appears in a Federal Rule rather than in a statute. *United States v. Neff*, 598 F.3d 320, 323 (7th Cir. 2010); see generally *Hamer v. Neighborhood Housing Svcs. of Chicago*, 138 S. Ct. 13, 20 (2017) (distinguishing between jurisdictional and mandatory claims-processing rules); *United States v. Rollins*, 607 F.3d 500, 501 (7th Cir. 2010) (same). The 60-day civil deadline where the United States is a party is statutory, however, established by 28 U.S.C. § 2107(b), so it is jurisdictional. The government has raised the timeliness issue properly, so we must decide the issue, whether as a matter of appellate jurisdiction or the claims-processing rule.

Under the 2013 settlement agreement, the district court retained jurisdiction "in order to implement and enforce" the settlement of the forfeiture issues. 2013 Settlement Agreement ¶ 22. Though Mr. Segal himself titled the motion at issue as one to modify the underlying forfeiture order, the district court focused on the real substance of the relief sought, which was rescission or modification of the settlement agreement. That was the correct focus. The court's order resolved what

was in essence a civil dispute embedded within a criminal case.

Defendants' appeals from decisions modifying or refusing to modify forfeiture orders in criminal cases are ordinarily governed by Federal Rule of Appellate Procedure 4(b) because criminal forfeitures are "punishment" and therefore part of a criminal sentence. *Libretti v. United States*, 516 U.S. 29, 39 (1995) ("Congress conceived of forfeiture as punishment for the commission of various drug and racketeering crimes."); *United States v. Infelise*, 159 F.3d 300, 302 (7th Cir. 1998) ("There is no question that, in general, forfeiture is part of the sentence and is appealable."); *United States v. Apampa*, 179 F.3d 555, 556–57 (7th Cir. 1999) ("[T]he *core* of a 'criminal case' to which Rule 4(b) applies is the sentence…. A forfeiture that constitutes part of the punishment in a criminal prosecution is governed by Rule 4(b).").

Appellants in criminal cases do not often attempt to rely on the longer appeal deadlines for civil cases, but in several such appeals filed under the umbrella of criminal cases, we have applied a pragmatic approach that looks to the "substance and context, and not the label, of the proceeding appealed from [to] determine its civil or criminal character." *Betts v. United States*, 10 F.3d 1278, 1283 (7th Cir. 1993) (applying civil deadline to appeal from denial of certificate of innocence). We have taken this approach because "many appealable orders technically 'in' criminal cases look more civil than criminal," especially when they pertain to "postjudgment remedies … collateral to criminal punishment." *United States v. Taylor*, 975 F.2d 402, 403 (7th Cir. 1992) (applying civil deadline to appeal of denial of order for return of seized property); *United States v. Lee*, 659 F.3d 619, 620–21 (7th Cir. 2011)

(applying civil deadline to appeal of order to defendant to turn over funds in retirement accounts), citing *United States v. Kollintzas*, 501 F.3d 796, 800–01 (7th Cir. 2007) (allowing government to pursue garnishment and other civil debt collection techniques under umbrella of criminal case); *United States v. Santiago*, 826 F.2d 499, 502 (7th Cir. 1987) (applying civil deadline to surety's appeal of forfeiture of bail bond: "a bail bond is a civil contractual agreement between the government and the surety on behalf of the criminal defendant"); cf. *Lilly*, 206 F.3d at 760 (applying criminal deadline where defendant sought declaration that he had satisfied his forfeiture obligation, which was a condition of ongoing supervised release portion of sentence); *Apampa*, 179 F.3d at 556 (applying criminal deadline to defendant's appeal of forfeiture portion of sentence).

We apply that pragmatic approach here. To do so, we must overlook the unfortunate title of Mr. Segal's filing in the district court: "Motion to Modify Forfeiture Order." Under *Apampa*, 179 F.3d at 556, a true request to modify a criminal forfeiture order would be subject to the deadline for criminal appeals, which Mr. Segal missed. In this case, however, there has been no forfeiture order in effect against Mr. Segal since the 2013 settlement. The parties agreed that the settlement would satisfy his forfeiture obligations. The district court thus properly focused on the substance of the motion, which sought to set aside and/or modify the settlement agreement.

Consistent with *Betts*, *Taylor*, and *Lee*, in Mr. Segal's appeal we too treat that settlement as a contract and treat the dispute

about it as a civil matter. Mr. Segal presents a civil appeal, so his notice of appeal was timely under Rule 4(a).[1]

We also find that the order from which Mr. Segal appeals was appealable even though liquidation proceedings continue in the district court. He sought what amounts to injunctive relief—the immediate transfer of property—by either

---

[1] Our approach is consistent with decisions from other circuits applying the civil deadline of Rule 4(a) to similar, essentially civil, proceedings within criminal cases. E.g., *Palma v. United States Dep't of Alcohol, Tobacco, and Firearms*, 228 F.3d 323, 327–28 (3d Cir. 2000) (applying civil deadline to government's appeal from decision granting defendant relief from ban on possessing firearms: "A proceeding can not be defined as criminal merely because it arises from, or pertains to, a prior criminal proceeding."); *United States v. Holland*, 214 F.3d 523, 526 (4th Cir. 2000) (applying civil deadline to government's appeal from order awarding attorney fees to acquitted defendants under Hyde Amendment: "Ancillary motions in a criminal case are not necessarily criminal…. [A] proceeding that is basically civil should be considered a civil action even if it stems from a prior criminal prosecution."); *United States v. Alcaraz-Garcia*, 79 F.3d 769, 772 n.4 (9th Cir. 1996) (applying civil deadline to third party's appeal of denial of petition to amend forfeiture claim); *United States v. Truesdale*, 211 F.3d 898, 902–03 (5th Cir. 2000) (applying civil deadline to acquitted defendants' appeal of denial of attorney fees under Hyde Amendment); *United States v. Lavin*, 942 F.2d 177, 181–82 (3d Cir. 1991) (applying civil deadline to third party's appeal of denial of its petition for property seized in criminal forfeiture proceedings); see also *United States v. Brouillet*, 736 F.2d 1414, 1415 (10th Cir. 1984) (en banc) (applying civil deadline to appeal from order relating to forfeiture of bail bond). For a collection of cases addressing the boundary between civil and criminal appeals, see 20 James Wm. Moore, *Moore's Federal Practice* §§ 304.10 and 304.20 (3d ed. 2019). Specific statutory language may offer guidance in classifying particular matters, but in the absence of such specific guidance for this dispute over a settlement agreement, we apply our pragmatic approach based on the nature of the proceeding and how closely it was tied to the actual conviction and punishment of the defendant.

rescinding or interpreting the 2013 settlement agreement. See R. 2065 (prayer for relief); *United States v. Kovich*, 201 F.2d 470 (7th Cir. 1953) (order directing landlord to restore personal property to tenants was an appealable injunction); see also *Segal*, 811 F.3d at 259 (resolving appeals of similar disputes under same settlement agreement). The district court's denial of Mr. Segal's motion was thus appealable under 28 U.S.C. § 1292(a)(1).[2]

B.  *Merits of Mr. Segal's Appeal*

With jurisdiction to consider the merits of Mr. Segal's appeal, we find that his challenges to the district court's orders are groundless.

1.  *The Unconscionability Challenge*

Mr. Segal reprises longstanding complaints about the supposed unfairness of the forfeiture order against him. See, e.g., 644 F.3d at 365. In his motion to modify and this appeal, he argues more specifically—and for the first time—that the 2013 settlement agreement is unenforceable because it is both procedurally and substantively unconscionable. We review *de novo* a district court's interpretation of a written settlement agreement, *United States v. Rand Motors*, 305 F.3d 770, 774 (7th Cir. 2002), although we recognize and benefit from Judge

---

[2] Mr. Segal's choice to file his notice of appeal after the criminal deadline was a high-risk litigation strategy. Compare, e.g., *Lavin*, 942 F.2d at 181–82 (applying civil deadline to third party's appeal of denial of its petition for property seized in criminal forfeiture proceedings), with *Apampa*, 179 F.3d at 556–57 (applying criminal deadline to dismiss criminal defendant's appeal of forfeiture portion of sentence, distinguishing between civil and criminal forfeiture). Future appellants bringing quasi-civil appeals under the umbrella of a criminal case might consider a more conservative approach to the deadline.

Castillo's long and patient work in this case. Applying Illinois law to interpret the contract and the circumstances of its formation without apparent objection from the government, the district court found "Segal's effort to paint himself as a powerless victim of an overzealous government entirely unpersuasive" and concluded there was "nothing inherently unfair about the Settlement Stipulation or the process used to negotiate it." R. 2100 at 5. For several reasons, we agree.[3]

The 2013 settlement agreement was the product of intense negotiations between the government and a well-counseled defendant. The heart of that agreement is its division of property. During their negotiations, Mr. Segal and the government drew up two lists of assets that became Exhibits A and B to the settlement agreement. Exhibit A listed all of the assets then restrained by the government. Exhibit B listed which of those assets would be released to Mr. Segal pursuant to the

---

[3] Strictly speaking, the federal common law of contracts should apply to this contract with the United States government. See *United States v. Seckinger*, 397 U.S. 203, 209 (1970); *Rand Motors*, 305 F.3d at 774. Under *Clearfield Trust Co. v. United States*, "the rule of *Erie* … does not apply to this action" because applying state law to contracts with the United States government "would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states. The desirability of a uniform rule is plain." 318 U.S. 363, 366–67 (1943); see also Henry J. Friendly, *In Praise of Erie—and of the New Federal Common Law*, 39 N.Y.U. L. Rev. 383, 405 (1964) (in rejecting a "general federal common law," *Erie Railroad* "opened the way to what, for want of a better term, we may call specialized federal common law"); 19 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 4515, *Areas of Competence for the Formulation of Federal Common Law—Conflicts Between State Law and Federal Interests* (3d ed.). Here, both Illinois and federal common law lead to the same conclusion: the 2013 settlement agreement is neither procedurally nor substantively unconscionable.

settlement agreement. Mr. Segal disclaimed any interest in the assets listed on Exhibit A but not on Exhibit B. 2013 Settlement Agreement ¶ 10 ("It is further agreed that defendant Michael Segal shall release any and all claims to any and all remaining real or personal property, proceeds from the sale of any properties, real or personal, and corporate assets, identified on Exhibit A and not listed on Exhibit B attached to the Settlement Stipulation.").

Mr. Segal's unconscionability argument rests on the contention that the government has improperly retained assets that belong to him because they were previously titled in his name, not NNIB's. This contention is now beside the point for two independent reasons. First, this court and the district court have repeatedly noted that the commingling of Mr. Segal's and NNIB's finances was integral to the fraud Mr. Segal committed, making nominal ownership of assets only a starting point in, not a definitive guide to, determining property rights. See, e.g., 495 F.3d at 830–31; 644 F.3d at 367; R. 2100 at 6. The confusion over ownership was an important consideration underlying both sides' agreement to the settlement. Second, and more critical at this late stage, Mr. Segal had the right to test ownership of the contested assets by evidentiary hearing scheduled for early 2013. Instead, he chose to settle, accepting the terms of that agreement in lieu of any prior claims he might have asserted. See 2013 Settlement Agreement ¶ 10.[4]

---

[4] As part of the settlement, the government released a number of valuable assets to Mr. Segal free and clear of any forfeiture claims, including $2.15 million in liquid accounts, ownership interests in at least six privately held companies, and several insurance policies.

Mr. Segal also argues that the agreement is substantively unconscionable because, in his estimation, the government got the better end of the deal—that is, he believes the government may ultimately net more than $15 million. The agreement contains no such cap. Mr. Segal's original personal forfeiture obligation was $15 million, and he was also ordered to forfeit his entire interest in NNIB. The settlement agreement *replaced* that personal $15 million obligation and the obligation to forfeit his interest in NNIB by ceding the assets "identified on Exhibit A and not listed on Exhibit B" to the government. 2013 Settlement Agreement, ¶ 10. As the district court explained: "Part of accepting the settlement was accepting the asset valuations the parties estimated at that time…. The fact that the valuations may have turned out differently than Segal predicted does not give him *carte blanche* to rewrite the parties' agreement." R. 2100 at 8, quoting *United States v. Bownes*, 405 F.3d 634, 636 (7th Cir. 2005) ("In a contract … one binds oneself to do something that someone else wants, in exchange for some benefit to oneself. By binding oneself one assumes the risk of future changes in circumstances in light of which one's bargain may prove to have been a bad one. That is the risk inherent in all contracts; they limit the parties' ability to take advantage of what may happen over the period in which the contract is in effect."); see also *United States v. Paccione*, 948 F.2d 851, 856–57 (2d Cir. 1991) (strictly enforcing against the government a settlement agreement in fulfillment of a forfeiture obligation).

The unconscionability argument also fails for another reason. In Mr. Segal's 2016 appearance before this court, he sought and won strict enforcement of the settlement agreement, resulting in a favorable order preserving Mr. Segal's right to repurchase a valuable interest in the Chicago Bulls.

811 F.3d 257. The doctrine of judicial estoppel "protects the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 795 (7th Cir. 2013) (citations and internal quotation marks omitted). Mr. Segal is now attempting just such a manipulation, arguing that the same contract he previously succeeded in enforcing for his benefit should now be set aside as unconscionable. He is judicially estopped from pursuing this challenge.

### 2. *The "Windfall" Theory*

Mr. Segal also contends that the government has received an improper "windfall" of assets in excess of his $15 million forfeiture obligation. This assertion has no merit. As noted, the settlement agreement contains no $15 million cap on the assets the government was entitled to receive. Such a cap would have made little sense, moreover, because the settlement agreement applied to assets of both Mr. Segal and NNIB.

As part of this challenge, Mr. Segal also contends the district court erred back in 2013 when it approved the settlement agreement without independently confirming the factual basis of the settlement agreement. He contends the court had such a duty under Federal Rule of Criminal Procedure 32.2(b)(1)(A). That rule provides in relevant part: "If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay."

Under the rule's language, the court is obliged to determine "the requisite nexus" only when a forfeiture of "specific property" is at stake, and only in the context of the original forfeiture order itself, not a settlement agreement. Here, the items of Mr. Segal's and NNIB's assorted property were offered as substitute assets to fulfill a money judgment against him personally. He challenges here not a forfeiture order but the settlement agreement that the parties agreed would fulfill the underlying forfeiture order. The district court therefore did not have, and in 2013 did not fail in the exercise of, any independent duty under Rule 32.2. Mr. Segal's attempt to raise this issue years after the entry of the forfeiture order is also untimely at best. Nor will we apply this rule of criminal procedure in an appeal that we are otherwise treating as civil—at Mr. Segal's request.

Since signing the settlement agreement in 2013, Mr. Segal's only remaining interest has been to ensure that he in fact received the assets listed on Exhibit B. He has no legally cognizable interest in what the government does with the remaining Exhibit A assets or in what they are worth. We agree with the district court that the four corners of the 2013 agreement control Mr. Segal's rights and interests. The district court correctly denied Mr. Segal's effort to modify or rescind the settlement agreement.

II. *Joy Segal's Attempts to Intervene*

We now turn to Joy Segal's appeal, which also presents both jurisdictional and contractual issues. In her case, the two are intertwined to an unusual degree. Joy Segal has her own settlement agreement with the government. The Segals divorced in June 2005, not long after Mr. Segal's June 2004 conviction. Based in part on property rights purportedly granted

to her by the Segals' marital property settlement, in February 2006 Ms. Segal filed a third-party claim under 18 U.S.C. § 1963(*l*) to some of the assets at issue in Mr. Segal's forfeiture proceedings. She settled this claim with the government in November 2010, and was well represented by able counsel. Under her settlement agreement, the government released to Ms. Segal about $7.7 million in assets, including two residences, a restaurant, jewelry, financial accounts, retirement accounts, and life insurance policies.

As we read the record, it appears that Ms. Segal has two objectives, one long-term and one near-term. For the long term, Ms. Segal claims that she is entitled to return of the assets of hers the government allegedly collected as substitute assets in fulfillment of her ex-husband's $15 million forfeiture judgment. Endorsing Mr. Segal's "windfall" arguments, she says that the government has collected all that it is entitled to and that she is now entitled to much of the rest, including assets that she claims as her personal property and marital share pursuant to the divorce settlement. And in the short term, she says, she is entitled to an accounting from the government to ensure that her assets are not being used improperly—for example, to satisfy creditors of Mr. Segal or NNIB. Accordingly, in September 2017 Ms. Segal moved to intervene under Federal Rule of Civil Procedure 24(a) and (b). This was her fifth similar attempt. The district court denied her motion on the record at a hearing on October 4, 2017. R. 2122. Ms. Segal filed her notice of appeal on November 7, 2017.

The government argues that 18 U.S.C. § 1963(*l*) provides the exclusive means by which a third party may assert a claim to property subject to forfeiture under RICO. That is true when a party seeks to "intervene in a trial or appeal of a

criminal case involving the forfeiture of such property under this section." § 1963(i)(1). But we are treating the underlying proceeding in which Ms. Segal seeks intervention—supervision of Mr. Segal's settlement agreement—as in essence a civil case embedded in the larger criminal case. The government is not pursuing any further forfeiture under § 1963. Its rights, like those of Mr. Segal and Ms. Segal, have been defined for years by the respective settlement agreements. Subsections 1963(i) and (*l*) no longer apply.

In fact, Ms. Segal exercised her § 1963(*l*) right of intervention back in 2006, leading toward her 2010 settlement, from which she obtained $7.7 million in property. That agreement provides the only potential basis for her to assert a right to intervene. Federal Rule of Civil Procedure 24 therefore provides the proper framework for analysis, and for reasons that parallel our discussion of appellate jurisdiction of Mr. Segal's appeal, we find that Ms. Segal's appeal is timely under the 60-day deadline in Federal Rule of Appellate Procedure 4(a)(1)(B). In addition, in civil cases, courts of appeals apply a "special rule" of finality under which "a party whose motion to intervene has been denied may take an immediate appeal." *United States v. City of Milwaukee*, 144 F.3d 524, 528 (7th Cir. 1998). (In *City of Milwaukee* itself, we dismissed an appeal from an order denying intervention without prejudice for failure to comply with the procedural requirements of Civil Rule 24(c) because the movant could have cured the defect by refiling. See *id*. at 527–28. That reason for dismissal does not apply here.) We thus have jurisdiction over Ms. Segal's appeal from

the district court's denial of her motion to intervene under 28 U.S.C. § 1291.[5]

---

[5] Appellate jurisdiction for both of these appeals is based on the existence of the settlement agreements, separate and distinct from Mr. Segal's forfeiture order. If Ms. Segal's appeal were considered an appeal from her § 1963(*l*) claim, it would be years late. More generally, we must caution that parties seeking to appeal orders in RICO or other criminal forfeiture proceedings may find only limited guidance from this opinion. Such proceedings are governed by Federal Rule of Criminal Procedure 32.2. Rule 32.2(c) governs ancillary forfeiture proceedings and provides for a unique blend of civil and criminal procedures: "After disposing of any motion filed under Rule 32.2(c)(1)(A) and before conducting a hearing on the petition, the court may permit the parties to conduct discovery in accordance with the Federal Rules of Civil Procedure if the court determines that discovery is necessary or desirable to resolve factual issues. When discovery ends, a party may move for summary judgment under Federal Rule of Civil Procedure 56." Fed. R. Crim. P. 32.2(c)(1)(B). The advisory committee's notes to Rule 32.2 clarify that the civil appeal deadline of Federal Rule of Appellate Procedure 4(a) applies to motions filed under 32.2(c): "Because an ancillary hearing is connected to a criminal case, it would not be appropriate to make the Civil Rules applicable in all respects. The amendment, however, describes several fundamental areas in which procedures analogous to those in the Civil Rules may be followed. These include the filing of a motion to dismiss a claim, conducting discovery, disposing of a claim on a motion for summary judgment, and *appealing a final disposition of a claim*. Where applicable, the amendment follows the prevailing case law on the issue." Fed. R. Crim. P. 32.2 advisory committee's note to 2000 adoption (collecting cases; emphasis added); see also, e.g., *United States v. Butt*, 930 F.3d 410, 413 (5th Cir. 2019) (applying civil deadline to appeal from denial of criminal defendant's sister's petition for an ancillary hearing).

However, "[w]hen the ancillary proceeding ends, the court must enter a final order of forfeiture by amending the preliminary order as necessary to account for any third-party rights." Fed. R. Crim. P. 32.2(c)(2). Under Rule 32.2(b)(4)(C), any appeals from a final order of forfeiture or an order amending it, or orders denying forfeiture or amendment, are governed by

Reaching the merits of Ms. Segal's appeal, we agree with the district court that Ms. Segal has no right to intervene at this time. In relevant part, Civil Rule 24(a)(2) grants a right of intervention to anyone who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." A party may intervene as of right when "(1) the motion to intervene is timely filed; (2) the proposed intervenors possess an interest related to the subject matter of the action; (3) disposition of the action threatens to impair that interest; and (4) the named parties inadequately represent that interest." *Wisconsin Educ. Ass'n Council v. Walker*, 705 F.3d 640, 657–58 (7th Cir. 2013).

The second factor is dispositive: Ms. Segal has no cognizable interest at this time. Paragraph 15 of her settlement agreement provides the only basis for her claimed interest:

> Upon entry of an order approving this Settlement Stipulation and notice to ensure that no third party may have a claim to or against any such property under applicable law, claimants Joy Segal and [Joy and Michael's son] Jonathan Segal shall disclaim any right, title, or ownership interest that they may have had in any of the remaining property so that the property can be forfeit and disposed of according to law.

---

the criminal appeal deadline of Federal Rule of Appellate Procedure 4(b). This rule applies to the extent that the final order encompasses the resolution of any third-party claims.

> Further, they are unaware of any third party
> who has a claim cognizable under Title 18,
> United States Code, Section 1963 to the remain-
> ing property subject to forfeiture. In the event
> that the remaining property is released at any
> time and/or not otherwise ordered forfeit at the
> completion of all proceedings, including by any
> modifications to or revocation of the forfeiture
> judgment by the Court or any reviewing court,
> the claimants, Joy Segal and Jonathan Segal, are
> not barred by the terms of this document from
> asserting an interest in that property if the
> United States asserts no further interest in or
> claim to the property.

The first and last sentences hold the keys. Under the first sentence of paragraph 15, Ms. Segal no longer has a claim to any property the government has restrained pending Mr. Segal's forfeiture proceedings (save, of course, the property specifically transferred to her pursuant to paragraph 11 of her settlement agreement). And under the last sentence, Ms. Segal can assert no further claims to forfeited property until forfeiture proceedings are completed—if any property remains. (The government believes it is unlikely any property will remain because of Mr. Segal's and NNIB's outstanding debts and tax liens. R. 2078 at 4.) In other words, in the 2010 settlement agreement, Ms. Segal expressly disclaimed any right to restrained and/or forfeited property during the time between the agreement's effective date and the "completion of all [forfeiture] proceedings." 2010 Settlement Agreement, ¶ 15. Those proceedings are ongoing, so she has no right to that property.

Nor does Ms. Segal's 2005 divorce grant her any additional claim to the restrained assets, nor a right to an accounting while forfeiture proceedings continue, as she claims in the proposed complaint for declaratory judgment attached to her motion to intervene. The Segals' marital settlement gave her property rights as against Mr. Segal, but it did not (and could not) thereby allow her to remove assets from the pool of property restrained by the government before the divorce. Ms. Segal properly pursued her claim to restrained assets in the § 1963(*l*) proceedings of 2006–10, resulting in the settlement agreement we interpret and enforce here. That agreement encompasses all of her remaining rights to the property at issue vis-à-vis the government. It controls here.

Ms. Segal's potential claim to remaining restrained property will not come to life unless and until that property "is released at any time and/or not otherwise ordered forfeit at the completion of all proceedings … if the United States asserts no interest or further claim to the property." 2010 Settlement Agreement ¶ 15. That has not happened yet, and it may never happen. She has no interest to assert at this time and may not intervene as of right. For this same reason, the district court did not abuse its discretion by denying permissive intervention. See *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 949 (7th Cir. 2000) (orders denying permissive intervention are reviewed for abuse of discretion).

Accordingly, we affirm the district court's denial of Ms. Segal's motion to intervene. Any right of intervention she might have is not yet ripe and may never be, so we agree with the district judge that she had no standing to bring the motion in the district court in the first place. See R. 2123 at 10 ("mere speculation is not a case or controversy"). As the district court

has repeatedly ruled, at the conclusion of forfeiture proceedings, Ms. Segal will be notified of her right to participate and may choose to try to intervene at that time. R. 2123 at 9. But until "the entire premise of that intervention" materializes, *id.*, she must wait.

* * *

We conclude by addressing appellants' litigation behavior. The motion to intervene that Ms. Segal appeals here is her fifth nearly identical attempt with at least as many attorneys, despite having been told by the district court clearly and correctly that she has no standing to bring any such claims until the close of forfeiture proceedings. The settlement agreement—from which she has already benefitted—is crystal clear on this point.

Mr. Segal's tactics are more egregious. His 68-page reply in the district court relied mostly on "gratuitous attacks on counsel," with "page after page of vitriol against one of the prosecutors," a brief which that court "would have been justified as striking as overlength and improper." R. 2100 at 5. In his brief on appeal, Mr. Segal accuses the government of all sorts of serious wrongdoing—such as that it outright "fabricated the record"—without offering any evidence. The legal arguments that Mr. Segal raised in the district court and in this court are baseless, hyperbolic, and conspiratorial. And they are diametrically opposed to arguments he has made successfully earlier in the case.

Mr. Segal and Ms. Segal have asked us to treat these appeals and the post-settlement portions of the case as procedurally civil, and we have done so. But civil procedure giveth and civil procedure taketh away. By now the saga of *United*

*States v. Segal* should be over, except insofar as the parties make objectively reasonable and good-faith attempts to enforce the express terms of their respective settlement agreements. If there are further proceedings in this matter, the parties and their counsel will be subject to the requirements of Federal Rule of Civil Procedure 11, and under 28 U.S.C. § 1927, counsel may be liable for excessive costs for unreasonable multiplication of proceedings.

The district court's orders denying Michael Segal's motion to modify his settlement agreement are AFFIRMED. The district court's orders denying Joy Segal's motions to intervene and for declaratory judgment are also AFFIRMED.